## GEORGE S. WRIGHT *v.* JAMES M. RYDER.

CONSTRUCTION OF COVENANT.—A covenant not to run or employ, or suffer to be run or employed, a steamboat upon any of the routes of travel on the rivers, bays, or waters of the State of California for the period of ten years, applies not only to existing routes of travel, but to all new routes opened during the ten years.

AGREEMENT IN RESTRAINT OF TRADE.—An agreement in partial restraint of trade, restricting it within certain reasonable limits, or confining it to particular persons, is, if founded upon a good consideration, valid.

IDEM.—Such a contract, if it include the entire area of a State, is unreasonable and void, as against public policy.

COVENANT IN RESTRAINT OF TRADE VOID.—If the purchaser of a steamboat, at the time of the purchase, covenants with the seller that he will not run or employ, or suffer to run or be employed, the said boat for ten years upon any of the routes of travel of the waters of a State, the covenant, being in restraint of trade and commerce, is void, as against public policy.

APPEAL from the District Court, Fourth Judicial District, City and County of San Francisco.

The California Steam Navigation Company is and has been for many years a corporation organized under the laws of California for navigating the Pacific Ocean and the waters of the State of California, with boats or vessels in whole or in part propelled by steam. The Oregon Steam Navigation Company has also for several years been a corporation organized under the laws of the State of Oregon for the purpose of engaging "in the navigation, by steam or otherwise, of the Columbia' River from its mouth to the forty-ninth parallel of north latitude, and Snake River from its mouth to Fort Boise, and Williamette River from its mouth to Eugene City, and the Pacific and other oceans."

On the second day of May, 1864, said California Steam Navigation Company owned the steamboat "New World" and her machinery, and sold her to the Oregon Steam Navigation Company; and· said last named company, in part consideration of the sale, executed and delivered to the California Steam Navigation Company the following instrument in writing:

"*Memorandum of the agreement made and entered into between*

*the Oregon Steam Navigation Company, of the State of Oregon, and the California Steam Navigation Company, of the State of California.*

"Whereas, the said California Steam Navigation Company have sold to the said Oregon Steam Navigation Company the steamboat called the New World, for the consideration of the sum of seventy-five thousand dollars, and also for a covenant and agreement by the said Oregon Steam Navigation Company that the said steamboat shall not be run upon any of the routes of travel on the rivers, bays, or waters of the State of California for the period of ten years from the first day of May, 1864:

"Now, these presents are intended to evidence the said covenant and agreement; and the said Oregon Steam Navigation Company, for themselves, their successors and assigns, hath agreed, and doth hereby covenant and agree, in consideration of the premises, that they will not run or employ, or suffer to be run or employed, the said steamboat New World upon any of the routes of travel on the rivers, bays, or waters of the State of California for the period of ten years from the first day of May, 1864.

"And the said Oregon Steam Navigation Company have further covenanted and agreed that the machinery of the said steamboat New World shall not be run or employed in running any steamboat, vessel, or craft upon any of the routes of travel on the rivers, bays, or waters of the State of California for the period of ten years from the first day of May, 1864.

"And the said Oregon Steam Navigation Company doth hereby agree that, in case of any breach of this covenant and agreement, to pay to the said California Steam Navigation Company the sum of seventy-five thousand dollars, in gold coin of the United States, as actual liquidated damages; but this provision shall not have the effect to prevent the said California Steam Navigation Company from taking such

other remedy, by injunction or otherwise, as they may be advised.

"In witness whereof, the said Oregon Steam Navigation Company hath caused this instrument to be signed by its President and countersigned by its Secretary, and their corporate seal to be affixed, at Portland, Oregon," etc.

"[Signed,]　　　J. C. AINSWORTH, Pres't O. S. N. Co.

"[SEAL O. S. N. CO.]

"[Signed,]　　　GEO. W. MURRAY, Sec'y O. S. N. Co."

On the 18th day of February, 1867, the said Oregon Steam Navigation Company executed and delivered to Henry Winsor a bill of sale of said steamboat and machinery sufficient in law to transfer the title thereto, which bill of sale contained the following provision:

"And it is understood and agreed that this sale is upon the express condition that said steamboat or vessel is not within ten years from the first day of May, 1867, to be run upon any of the routes of travel, on the rivers, bays, or waters of the State of California, or the Columbia River and its tributaries; and that during the same period last aforesaid, the machinery of the said steamboat shall not be run or employed in running any steamboat or craft upon any of the routes of travel on the rivers, bays, or waters of the State of California, or the Columbia River and its tributaries."

In consideration of said sale, Clavrick Crosby, Henry Winsor, Nathaniel Crosby, and Calvin N. Hale, at the same time executed and delivered to said Oregon Steam Navigation Company a bond conditioned for the observance of said provision. In said bond it is recited that said obligors were joint purchasers of said New World and her machinery.

On the 7th day of March, 1867, said Winsor executed and delivered to said Hale a bill of sale of said vessel and machinery, and delivered the same. Said bill of sale did not contain any provision or condition.

Thereafter, and on the 23d of November, 1867, said obligors in said bond, except said Hale, executed and delivered to plaintiff and Duncan B. Finch a bill of sale in the usual form, of said steamboat and machinery, but said bill of sale did not contain said provisions, or any allusions thereto; nor did said plaintiff or Finch ever enter into any agreement or execute any bond in any manner relating or alluding to said agreement of the Oregon Steam Navigation Company, or said provision in the bill of sale to said Winsor. At that date said Finch and Wright knew the terms of said provision, and the contents of the agreement of the Oregon Company.

On the 16th day of July, 1868, the defendant Ryder applied to the plaintiff Wright to purchase the "New World" and her machinery, for the purpose of running the same as a passenger and freight boat from San Francisco to Vallejo, a town on the Bay of San Francisco, about thirty miles distant from San Francisco; and thereupon it was agreed between the plaintiff and defendant in writing, signed by each, and mutually delivered, as follows:

"1st. That plaintiff was the sole owner of said steamboat, her machinery, etc.

"2d. That plaintiff had good right and lawful authority to sell and convey the same to defendant.

"3d. That defendant would and should have good right and lawful authority to run the said steamboat and her machinery as a passenger and freight boat from San Francisco aforesaid to said wharves near Vallejo aforesaid, and transport thereon, for hire, passengers and freight.

"4th. That defendant could not be finally enjoined or restrained, by any person or corporation, from running the same, and transporting thereby freight and passengers as aforesaid."

That within twenty days thereafter plaintiff would deliver

said boat and her machinery to defendant, and would execute and deliver to defendant a bill of sale, in due form of law, conveying the same to defendant. And on the part of defendant, it was agreed with plaintiff as follows:

"1st. That defendant would, on the execution and delivery of said bill of sale and tender of possession of said boat and machinery, accept the same and pay to plaintiff therefor twenty-two thousand five hundred dollars, gold coin, and execute and deliver to plaintiff his promissory note for forty-one thousand dollars, payable April 1st, 1869, in like coin, and a mortgage on said boat and her machinery to secure the same."

On the twentieth day after making said written agreement, plaintiff tendered to defendant possession of said boat and her machinery, and tendered to defendant a bill of sale, duly executed by plaintiff, sufficient in form to convey to defendant said steamboat and her machinery, and tendered to defendant a note and mortgage, to be executed by defendant pursuant to such agreement. The defendant on said day accepted possession of the boat and bill of sale, but refused to execute the note and mortgage and pay the twenty-two thousand five hundred dollars to the plaintiff. On the 10th day of August, 1868, the defendant offered to return to plaintiff the boat and machinery in the same condition as when he received it, but the plaintiff refused to receive it. The defendant did not know until after he received possession of the boat of the said agreement between the Oregon Steam Navigation Company and the California Steam Navigation Company, and the said provision contained in the bill of sale to Winsor.

The California Steam Navigation Company was, on the date of said agreement with the Oregon Company, and still is engaged in running steamboats and carrying passengers and freight for hire from the City of San Francisco to Vallejo and back. Said Oregon Steam Navigation Company, and

said California Steam Navigation Company, respectively, threatened to prevent defendant from running said boat and her machinery on the waters of the State of California, and published a notice to that effect in the public newspapers published in the City and County of San Francisco. Said steamboat was not at the time of the commencement of this suit in condition to be run as a freight and passenger boat between San Francisco and Vallejo, but would require the expenditure of thirty thousand dollars to put her in such condition.

On the 29th day of September, 1868, this action was commenced to recover judgment against the defendant for said sum of twenty-two thousand five hundred dollars, and to have the same declared a lien on the "New World," and to obtain further judgment compelling the defendant to execute and deliver a mortgage to the plaintiff for forty-one thousand dollars, the remainder of the purchase money.

The complaint set up the agreement of sale between plaintiff and defendant, and the delivery of the "New World," and demand on defendant to comply with the agreement, and his refusal, and prayed for relief. The answer set up the other facts recited as a defense. The plaintiff demurred to the answer, and the demurrer was sustained and judgment rendered for the plaintiff by default.

The defendant appealed.

The other facts are stated in the opinion of the Court.

*Wilson & Crittenden*, for the Oregon Steam Navigation Company.

By leave of the Court, and with the consent of the attorneys of appellant and respondent, we appear on behalf of the Oregon Steam Navigation Company, which, though not a party to the record, was a party to some of the transactions out of which this controversy has arisen, and is directly interested in the questions which it seems to be the object of this action to raise and to have determined by this Court.

The doctrine of the Courts in respect to contracts in restraint of trade has undergone many fluctuations. The rule declaring such contracts to be void seems to have originated in certain old laws of England, by which no person was allowed to engage in particular kinds of trade or business, without first serving a lengthy apprenticeship. It was supposed to be contrary to public policy for a person to bind himself not to engage in a business for which he had thus become qualified, as the public would be deprived of the benefit of his training and experience in such business, and the tendency of the contract, on account of the prohibition as to other kinds of business, would be to take from him the means of support, and reduce him to the position of a pauper. These and similar considerations induced the English Courts, at a very early day, to declare such contracts void; and so excessive was their aversion to them that they refused to admit any exceptions or qualifications. In the first reported case on the subject, (Year Book, 2 Henry V,) the Judges became indignant and threatened to send the plaintiff to prison; and for a long time contracts of this character were treated with the greatest severity. Eventually, however, a change took place, and modifications were gradually introduced, until, in various cases, and among others the case of *Mitchell* v. *Reynolds*, 1 P. Will. 181, it was held that while a contract in general restraint of trade was void, a contract limited to a particular place was not. The Courts of England have ever since acted in accordance with this view, but in respect to the limit to be assigned to the restraint they have frequently taken a very wide range. Thus, in *Whittaker* v. *Howe*, 43 Eng. Ch. 383, a solicitor had sold out his business and agreed not to practice in any part of Great Britain for twenty years, and the Court sustained the agreement. Without referring to other cases, it is sufficient to say that the settled doctrine in England is that where the contract is founded on a valuable consideration, the only question is as to its reasonableness, and that this is a question depending on the circumstances of each particular case.

In this country the English rule, as originally laid down, has never prevailed. The same reasons not existing here, the rule has uniformly been rejected by our Courts; and while, in many of. the cases, it is conceded, in deference to English adjudications, that contracts in general restraint of trade are invalid, a strong inclination has been exhibited to repudiate the whole doctrine on the subject. In *Presbury* v. *Fisher*, 18 Miss. 50, the Court said: "The liberality of our laws, in suffering any man to engage in any trade or occupation he may think best, without any previous apprenticeship, has blunted our perception of the utility of the principle which avoids contracts made in restraint of trade." Parsons, in speaking of the strict rule originally existing in England, says that "in the application of this rule we shall see a gradual enlargement, until in this country, at least, it seems to be little more than nominal." (2 Par. Con. 751.) He admits, however, that a contract without any limitation is void, and cites the case of *Alger* v. *Thacher*, 19 Pick. 51, where the defendant had executed a bond conditioned that he should never carry on or be concerned in the business of founding or casting iron.

In *Perkins* v. *Lyman*, 9 Mass. 494, an agreement by the defendant that he would not be engaged in or carry on the fur trade on the northwest coast of America for the space of seven years, was held to be valid. In *Stearns* v. *Barrett*, 1 Pick. 443, the parties, being joint inventors of certain machines, agreed between themselves that one should have the exclusive use and sale of the machines in Massachusetts and Rhode Island, and the other elsewhere throughout the United States; and the Court sustained the agreement. In *Palmer* v. *Stebbins*, 3 Pick. 188, a bond was maintained by which the defendant had bound himself to give the plaintiff the freighting of all his goods up and down the Connecticut River, and not encourage any other boatman to compete with the plaintiff in the business of boating.

In *Dunlop* v. *Gregory*, 10 N. Y. 241, the circumstances were similar to those existing in the present case. A steam-

boat had been sold under an agreement that she should not be run as a passenger boat on the Hudson River above a certain point. The Court sustained the agreement. We cite this case for the purpose of showing that if the provisions in question here are not invalid as being in restraint of trade, there is no other ground on which their validity can be attacked. In *Alcock* v. *Giberton*, 5 Duer, 76, an agreement was sustained binding the defendants never afterwards to engage in the business of manufacturing porcelain teeth, or imparting the knowledge of manufacturing the same to any other person than the plaintiff. There was no limitation either as to time or space. The case of *Jarvis* v. *Peck*, 10 Paige, 118, involved the same point and was decided in the same way. In *Presbury* v. *Fisher*, 18 Miss. 50, the defendants, being publishers of a counterfeit detector, sold their business to the plaintiff, and executed to him a penal bond conditioned that they should not thereafter engage in the business of publishing any such paper. The condition of the bond also included any other person, who subsequently commenced the publication of a detector; and the bond was held to be valid, although no limit was prescribed in it. In *Billings* v. *Ames*, 32 Miss. 265, the plaintiff, who was the owner of a patented process for putting up cemented hams, had sued the defendants for a violation of his patent; and the defendants, in consideration that the plaintiff would dismiss his suit, and allow them the partial use of the patent for a year, had agreed that they would not thereafter manufacture or put up cemented hams of any kind during the existence of the patent, no other limit being named.

In *Duffy* v. *Shockey*, 11 Ind. 70, the defendant had sold to the plaintiffs his marble and monument shop, and agreed that he would not establish a similar shop within certain limits, covering a space of several hundred miles. The agreement was held to be valid; and one of the questions was, whether the limits were reasonable. (See, also, *Chappel* v. *Brockway*, 21 Wend. 157; *Richardson* v. *Mellish*, 2 Bing. 229; *Cal. Steam Nav. Co.* v. *Wright*, 6 Cal. 258.)

Such contracts are not set aside because of their effect as between the parties, but because they are detrimental to the public good; and so long as the public are not injured by them, there is no policy to be subserved by declaring them invalid. If A. should contract with B. to pay him a sum of money in consideration that he would abandon his occupation as a carpenter, and B. should abandon it accordingly, the contract, looking at it merely as between the parties, would hardly be rejected as of no validity, although A. could not be benefited by the abandonment. And as the country is full of carpenters, we do not see in what way such a contract would be injurious to the public, and cannot imagine any rational ground on which it could be set aside.

In the present case, however, it is unnecessary to pursue this course of argument, for the restrictions imposed are such that no Court in this country, under any proper application of the rule laid down by the authorities here, can regard them as unreasonable. It was the right of the parties to protect themselves against the running of the boat to their injury, and there is nothing in the case indicating that they have done or attempted to do anything more.

Our next position is, that the doctrine relating to contracts in restraint of trade has no application to the provisions in question. No one is restrained by them from engaging in any business or occupation, and there is not the shadow of a reason for setting them aside as being injurious to the public. The owner of property may do with it as he pleases, and if he chooses to sell it, he is under no obligation to consult the public as to the terms of the sale. There is an obvious distinction, so far as the public are concerned, between a restraint affecting an individual in respect to his business, and one which merely affects him as to the use of particular property. There is some ground for saying that as to the former the public have an interest, but there is no foundation for any such position in regard to the latter. The cases in relation to business secrets seem to us directly in point in support of this view, for they show that in dealing with

interests of which a party has exclusive control, he may bind himself to any extent in respect to such interests. (*Bryson* v. *Whitehead*, 1 Eng. Ch. 74.)

*Patterson, Wallace & Stow*, for Respondent.

The first covenant, if valid and literally upheld, prohibits the running of the New World at any point within three English miles of the coast from the forty-second degree of north latitude to the southern boundary of the State, (Constitution, Article XII,) a distance equal to that from New York to San Augustine, Florida, on the Atlantic Coast, and to the navigable waters of the Mediterranean Sea.

The interior routes of travel of the State, upon which the boat is by covenant prohibited from running, are of almost equal extent. Thus: from Marysville to San Francisco, a distance of one hundred and sixty-one miles; from Petaluma to the same place, forty miles; from Suscol, forty-five miles; from Suisun, fifty miles; from Alviso, thirty miles; in all, three hundred and twenty-six miles.

Nor is this the whole extent of the restriction. The boat could not be run as a ferry boat between Oakland and San Francisco, nor could she make a trip from San Francisco to Guaymas, the Sandwich Islands, Victoria, Alaska, or any other port in the world, because necessarily in passing from a wharf in San Francisco through the Golden Gate, she must run upon the waters of the State of California—that is, upon waters within the bounds of the State and over which it has civil and criminal jurisdiction.

Add to this the condition that the Oregon Steam Navigation Company imposed, and the practical result is that the amount of capital represented by the New World is of no use to owners or the public until May, 1867.

The covenant, condition, and bond for its performance, are void.

"The general rule is, that all restraints of trade, if nothing more appears, are bad. * * * But if the restraint be

general—that is, not limited to a reasonable time and district—it is void at law, and, of course, will not be enforced in equity." (*Keeler* v. *Taylor*, 53 Pa. State, 468, 469.)

"The law," said Mr. Chief Justice Best, in *Home* v. *Ashford*, 3 Bing. 328, "will not permit any one to restrain a person from doing what his own interest and the public welfare demand that he should do. Any deed, therefore, by which a person binds himself not to employ his talents, his industry, or his capital, in any useful undertaking in the kingdom, would be void." (*Keeler* v. *Taylor*, 53 Pa. State, 469.)

It cannot be denied that the money invested in the "New World," her machinery, etc., is capital. Mr. Chief Justice Best was speaking of the kingdom of Great Britain; and if the restraint was co-extensive with the kingdom, the agreement, he says, would be void. The superficial area of that kingdom is less than the State of California, and its navigable waters are not greater than those of the coast of California, its internal waters, and the Columbia River and its tributaries. The superficial area of England, Scotland, Wales, and the islands in the British seas, being ninety thousand and thirty-eight square miles, and that of Ireland thirty-two thousand four hundred and eighty-one—in all, one hundred and twenty-two thousand five hundred and nineteen square miles; while the area of California is one hundred and eighty-eight thousand nine hundred and eighty-two. (Encyclopedia Brittanica, Vol. VIII, p. 715; National Almanac and Annual Record, Childs', Philadelphia, 1864; Encyclopedia Brittanica, Vol. IV, p. 96.)

In *Dunlap* v. *Gregory*, 6 Selden, 10 N. Y., 241, the agreement was that the steamboat "Robert L. Stevens" should not be run as a passage boat above the village of Saugerties. The restriction there was very limited; it did not prevent the boat from running as a freight boat from New York to Albany or Troy, or as both a freight and passenger boat in Long Island Sound, or in the harbor of New York; while

45

in the case of the "New World," it is, she shall not be run for any purpose.

While in that case the agreement was held valid at law as being limited or partial only in restraint of trade, yet the Court on page two hundred and forty-four said: "Contracts, upon whatever consideration made, which go to the total restraint of trade—such as obligate a man not to pursue his occupation, or exercise his trade anywhere in the State—are void." New York contains an area of forty-six thousand square miles—less than one quarter of that of California.

If, then, the agreement in that case had been that the "Robert L. Stevens" should not be run upon any of the waters of the State of New York, (which would have embraced a portion of Long Island Sound, the Hudson River, the St. Lawrence,. the Harbor of New York City, Lake Champlain, Lake Erie, Geneva Lake, Cayuga Lake, Lake Ontario, Seneca Lake, etc.,) the Court would have held it void.

See, also, *Lawrence* v. *Kidder,* 10 Barb. 642, an elaborate and well reasoned case, but too long for insertion here, the opinion in which was delivered by that eminent jurist, S. L. Selden: "General restraints are all void, whether by bond, covenant, or promise, etc., with or without consideration, and whether it be of the party's own trade or not." (Cro. Jac. 569; 1 Smith's Lead. Cases, 432.)

"That to obtain the sole exercise of any known trade throughout England, is a complete monopoly against the policy of the law." (Smith's Lead. Cases, 432.)

In *Ward* v. *Byrne,* 5 Mees. & Wels. 547, the condition of the bond was: "And also if the said Thomas Byrne shall not follow or be employed in the said business of a coal merchant, either directly or indirectly for the space of nine months after he, the said Thomas Byrne, shall have left the employment of the said W. Ward." And it was held void, because of a total restraint for the period of nine months from following the business of a coal merchant throughout

the area of England. (See *Hinde* v. *Gray*, 1 M. and Gr. 195; 1 Scott N. R.: 123.)

In *Price* v. *Green*, 16 Mees. & Wels. 346, the defendant covenanted not to carry on the trade of a perfumer, etc., within the Cities of London or Westminster, or within the distance of six hundred miles from the same respectively. The first part of the covenant was held valid, and the last void, because by the latter the restriction extended over the greater portion of the kingdom.

In *Stanton* v. *Allen*, 5 Denio, 434, a large portion of the proprietors of canal boats on the Erie and Oswego canals entered into an agreement to regulate the price of freight and passage, by a uniform scale to be fixed by a committee chosen by themselves, and to divide the profits in proportion to the number of boats employed by each, and agreeing not to engage in similar business out of the association.

Such agreement left the members of the association free to run boats on the Chemung, the Chenango, Cayuga and Seneca, Crooked Lake, Rlack River and Genesee Valley Canals, and yet it was held void, as being against public policy by the principles of the common law.

The learned counsel for the Oregon Steam Navigation Company place great reliance upon *California Navigation Company* v. *Wright*, 6 Cal. 258. A comparison of that case with the one at bar we think will demonstrate that it falls far short of upholding the validity of the covenant and bond we attack.

If any restriction is binding on Wright or Ryder, it must be because of the condition inserted in the bill of sale from the Oregon Steam Navigation Company to Winsor, on the theory that such condition runs with and limits the boat in whose hands soever she may be, because neither Wright or Ryder have signed any similar covenant, or accepted any bill of sale containing any similar condition.

We are not referred to any authority to the effect that such covenant or condition runs with the boat, and after

careful research being unable to find any, we assume there are none.

*B. S. Brooks*, for the Appellant, in Reply.

The first question that presents itself is whether the covenants in question bind any one. The plaintiff's counsel contends that the contract is so plainly against public policy that it binds no one. Of course it cannot be denied that it is in restraint of trade, and that it tends to create a certain monopoly. Indeed, we must be forced to admit that such was the intent and purpose of the contract. The California Steam Navigation Company are disposed to monopolize the entire steam navigation of this State, and the consequence of this desire is that they from time to time purchase every steamboat which is put on any of the waters of this State to run in opposition to their boats, and thus there accumulates on their hands a fleet of useless boats rotting quietly away in various creeks and bays of this State. Useless simply because they are not employed. The company must charge and the public must pay enough for the use of the few boats actually employed to pay for their entire fleet of boats unemployed, and travel and commerce are reduced and hampered by the excessive charges thus placed upon them.

Mr. Brooks confined his argument principally to the point not decided by the Court.

By the Court, CROCKETT, J.:

There are but two points presented on this appeal for our decision, to wit: First—Whether or not the covenants of the Oregon Steam Navigation Company to the California Steam Navigation Company, and the conditions in the bill of sale from the Oregon Steam Navigation Company to Winsor, and the bond of Winsor and others to said last named company, are void, as being in restraint of trade and against public policy; and Second—If they be conceded to be valid,

whether or not they can be enforced as against the defendant or against the steamer New World in his hands.

The general principles which govern contracts in restraint of trade are well settled, both in England and the United States. They proceed on the theory that the public welfare demands that private citizens should not be allowed, even by their own voluntary contracts, to restrain themselves unreasonably from the prosecution of trades, callings, or professions, or from embarking in business enterprises in the promotion and encouragement of which the public has an interest. At an early period in English jurisprudence, when trade and the mechanic arts were in their infancy, it was deemed a matter of the greatest public importance to encourage their growth and to prohibit contracts which tended to abridge them. Hence the rule first established was, that all contracts were void which in any degree tended to the restraint of trade, even in a particular, circumscribed locality, either for a definite or unlimited period. But as population and trade increased, and there was consequently a greater competition in all useful pursuits, the necessity for the stringent rule which before prevailed had in a greater measure ceased, and the rule itself was greatly relaxed and modified. Instead of denouncing as void all contracts in restraint of trade, the rule, as relaxed, tolerated such as were restricted in their operations within reasonable limits. Hence it has been repeatedly decided, both in England and America, that whilst a contract by an artisan not to follow his calling at any time or place was an unreasonable restraint upon trade, contrary to public policy, and therefore void, nevertheless if he contracted for a valuable consideration not to pursue his occupation within certain reasonable, restricted limits, the contract was valid and would be enforced. Thus, in *Alger* v. *Thacher*, 19 Pick. 51, the defendant had entered into a bond by which he bound himself not to carry on the business of an iron founder at any time or place, and the Court held the contract to be void, as an unreasonable restraint upon trade. This is a leading case on that point.

So, in *Keeler* v. *Taylor*, 53 Penn. 468, 469, the Court says: "But if the restraint be general, that is, not limited to a reasonable time and district, it is void at law, and of course will not be enforced in equity." In Story on Contracts, Sec. 550, the rule is thus stated: "An agreement in *general* or *total* restraint of trade is void, although it be founded on a legal and valuable consideration. * * * The same rule has been uniformly adhered to even to the present day; an agreement, therefore, not to carry on a certain business any-where is invalid, whether it be by parol or specialty, or whether it be for a limited or for an unlimited time;" and he quotes in support of the rule *Mitchell* v. *Reynolds*, 1 P. Will. 190; *Homer* v. *Ashford*, 3 Bing. 323; *Pierce* v. *Fuller*, 8 Mass. 223; *Nobles* v. *Bates*, 7 Cow. 307; *Morris* v. *Coleman*, 18 Ves. 436; *Hinde* v. *Gray*, 1 Man. & Grang. 195; *Alger* v. *Thacher*, 19 Pick. 51; to which may be added many other authorities from the Courts of England and America. "But," he adds, (Sec. 551,) "an agreement in *partial* restraint of trade, restricting it within certain reasonable limits or times, or confining it to particular persons, would, if founded upon a good and valuable consideration, be valid. * * * Such an agreement not only does not obstruct trade, but is oftentimes requisite and necessary, as well for the advantage of the public as of the individual." This proposition is maintained in *Rannie* v. *Irvine*, 7 Mann. & Grang. 976; *Chappel* v. *Brockway*, 21 Wend. 157; *Hartley* v. *Cummings*, 5 C. B. 247; *Bunn* v. *Guy*, 4 East. 190; *Pierce* v. *Woodward*, 6 Pick. 206; *Perkins* v. *Lyman*, 9 Mass. 522; *Hayward* v. *Young*, 2 Chit. 407; *Mallan* v. *May*, 11 Mees. & Wels. 653; *Wickins* v. *Evans*, 3 Young & Jerv. 318.)

In such cases, the difficulty lies in determining what are reasonable and what unreasonable restrictions, in respect to the area within which the restriction is to be confined. If it be unlimited in space, and is to operate everywhere, nearly all the authorities agree that the contract is void; and a rule established by the English Courts is, that if the restriction operates throughout the kingdom, the contract is void.

In this case, the covenant of the Oregon Steam Navigation Company to the California Steam Navigation Company is, "that they will not run or employ, or suffer to be run or employed, the said steamboat New World upon any of the routes of travel on the rivers, bays, or waters of the State of California, for the period of ten years from the 1st day of May, 1864." There is a similar covenant that the machinery of the boat shall not be run or employed to run any vessel or craft on any of the routes of travel, or on the rivers, bays, or waters of this State, for the same period. The covenant of Winsor and others to the Oregon Company is even broader, and includes the waters of the Columbia River and its tributaries. These covenants, if valid, and enforced by the Courts, would exclude the boat from all the navigable waters of California and the principal navigable waters of Oregon for the period of ten years. There is no force in the argument that the covenant to the California Steam Navigation Company applied only to the existing routes of travel, and not to new routes afterwards to be opened. As we construe it, the covenant applied to all routes of travel on the rivers, bays, or waters of the State then existing or which should be established within the period limited. If the validity of these covenants was to be tested solely by the question whether the limitation of the area within which they are to operate was reasonable or otherwise, we should have no hesitation in pronouncing them unreasonable and within the rule which holds such contracts to be void as against public policy. The covenants include the entire area of the State, and are therefore in this respect without limitation, within the meaning of the rule we have stated.

"Contracts which go to the total restraint of trade, as that a man will not pursue his occupation or carry on his business *anywhere in the State,* are void, upon whatsoever consideration they may be made." (*Chappel* v. *Brockway,* 21 Wend. 159; *Dunlop* v. *Gregory,* 10 N. Y. 244; *Homer* v. *Ashford,* 3 Bing. 328.)

In nearly all the adjudged cases cited by counsel, the questions decided arose under contracts made by tradesmen or others following particular occupations, whereby they bound themselves not to pursue their occupations either generally or within certain specified limits.    But in this case, the question comes up in another aspect.    The California Steam Navigation Company was largely engaged in navigating the waters of this State, and being the owner of the steamer New World, sold her to the Oregon Steam Navigation Company, upon an agreement that she was not, for the period of ten years, to be employed in navigating the waters of this State.    The object of this provision, obviously, was to prevent the New World from being employed as an opposition boat in competition with the boats of the California Steam Navigation Company, and counsel insist that such a transaction does not come within the rule which prohibits contracts in restraint of trade.    The argument is that being the owner of the boat, the California Steam Navigation Company had the lawful right to withdraw her from commerce entirely; and if they elected to do so, might have permitted her to rot at the dock, or have otherwise destroyed her, in which event the public could not have complained even though a great public inconvenience may have resulted from such conduct on the part of the company.

From the fact that the company, as owner, had this absolute power of disposition, the inference is drawn that it might impose whatever limitations it pleased on the future use of the boat; that it might have imposed it as a condition of the sale that the boat should be taken to pieces and its machinery destroyed, and consequently that it was competent for it to require that the boat should not thereafter run in a particular trade.    But precisely the same argument would apply to a tradesman who stipulates not to follow his trade at any time or place.    He may elect to abandon his calling altogether, however urgently the public may demand his services, or he may voluntarily disable himself from pursuing his avocation, and thus deprive the public of his services

entirely. But, as we have seen, it does not thence follow that he is bound by a *contract*, in which he stipulates that he will not pursue his avocation at any time or place. The reason of the rule is that though for the present he may intend and desire to abandon his trade or calling, as he has the right to do so, the law, on grounds of public policy, will not allow him to bind himself not to resume his avocation if he shall afterwards elect to do so. So, while the owner of a steamboat has the right to keep her idle, or to destroy her if he choose, however great may be the inconvenience to the public, it does not follow that he would be bound by a *contract* in which he stipulates never to employ her in the waters of this State. He might afterward change his mind and desire to engage in commerce with her in our waters, and on grounds of public policy he would not be bound by his contract. But we have grave doubts whether, in this age of abundant capital and active competition in all the avenues of commerce, the withdrawal of a single boat from our navigable waters could be deemed an appreciable restraint upon trade, or result in the slightest inconvenience to the public. The difficulty lies in fixing the line between that which is or is not an appreciable restraint of trade. If the California Steam Navigation Company, which now occupies our bays, rivers, and inlets with its fleet of steamboats, should suddenly convey them all to a purchaser on condition that they were not to be employed in navigating any of the waters of this State for a period of ten years, no one could doubt that this would operate as a great present calamity to the public, and the condition would be void as a restraint upon trade. On the other hand, if a sloop or schooner of fifty tons burden should be sold on a similar condition, the injury to the public would be scarcely appreciable. In like manner, if all the carpenters and masons in a large city should bind themselves not to prosecute their business in this State for a period of ten years, it might produce great public inconvenience; whereas, if only one carpenter or mason should enter into a similar

contract, the loss of his services might not be felt by the public.   And yet, in the latter case, we would be bound by a long line of adjudications in England and America to hold the contract void, as in restraint of trade.   The reasoning on which these decisions rest applies to the sale of a single boat as fully as to the case of a single tradesman; and we feel constrained, in deference to these decisions, to hold the contract in this case to be void.   This view of the case renders it unnecessary to consider the second point raised on the appeal.

The judgment is therefore affirmed.